Joseph J. Tabacco, Jr. (SBN 75484)
Nicole Lavallee (SBN 165755)
**BERMAN DeVALERIO PEASE**
 **TABACCO BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
Email: jtabacco@bermanesq.com
Email: nlavallee@bermanesq.com

ORIGINAL
FILED

DEC 7 2007

E-filing

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*Attorneys for Plaintiffs Albert L. Feldman and Eleanor Jean Feldman*

[Other counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CV 07              6218

|  |  |
|---|---|
| ALBERT L. FELDMAN and ELEANOR JEAN FELDMAN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> VERIFONE HOLDINGS, INC., DOUGLAS G. BERGERON, and BARRY ZWARENSTEIN, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. _____

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

## **INTRODUCTION**

1.    This is a securities fraud against Verifone Holdings, Inc. ("Verifone" or the "Company") and certain of the Company's officers and directors for violation of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This action is brought on behalf of all purchasers of the common stock of Verifone between March 1, 2007 and November 30, 2007, inclusive (the "Class Period").

2.    Verifone provides secure electronic payment solutions for the financial, retail, hospitality, petroleum, government and healthcare markets.

3.    On December 3, 2007, Verifone announced that its unaudited interim consolidated financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007, and the three and nine months ended July 31, 2007 should no longer be relied upon due principally to accounting errors related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects Verifone's reported costs of net revenue. Verifone announced that it would restate those financial statements "to correct errors that overstated previously reported inventories in material amounts" as of January 31, 2007, April 30, 2007, and July 31, 2007, and "understated cost of net revenues in material amounts" for the three month periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Verifone stated that "[a]ccordingly, investors are cautioned not to rely on Verifone's historical financial statements and earnings press releases and similar communications for the periods ended January 31, 2007, April 30, 2007 and July 31, 2007." Verifone's accounting errors, which overstated profit before taxes by approximately $30 million, eliminated 80% of Verifone's pre-tax profit for the first nine months of 2007.

4.    As a result of this shocking news, the price of Verifone stock fell approximately 45% from a closing price of $48.03 on November 30, 2007 to a closing price of $26.03 on December 3, 2007 on unusually high volume of over 49 million shares.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b), 1337. Defendant Verifone maintains its principal place of business within this District, and/or the individual defendants conduct business in and many of the acts giving rise to the violations complained of herein took place in this District.

7.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8.    Plaintiffs Albert L. Feldman and Eleanor Jean Feldman, as set forth in the accompanying Certification, incorporated by reference herein, purchased Verifone common stock at artificially inflated prices during the Class Period and have been damaged thereby.

9.    Defendant Verifone is a Delaware corporation with its principal place of business located at 2099 Gateway Place, Suite 600, San Jose, California. Verifone describes itself as "the global leader in secure electronic payment technologies."

10.    During the Class Period, defendant Douglas G. Bergeron ("Bergeron") was Chairman and Chief Executive Officer of the Company, signed the Company's SEC filings and was responsible for the Company's false financial statements. He also reaped proceeds of over $56 million by selling his Verifone stock during the Class Period.

11.    During the Class Period, defendant Barry Zwarenstein ("Zwarenstein") was Executive Vice President and Chief Financial Officer of the Company, signed the Company's SEC filings and was responsible for the Company's false financial statements. He also reaped over $6 million by selling his Verifone stock during the Class Period.

12.    Bergeron and Zwarenstein are referred to as the "Individual Defendants." Because of their positions with the Company, they possessed the power and authority to control the contents of Verifone's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations being made about Verifone's financial condition were materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

13.    Defendants are liable for (i) making false statements; or (ii) failing to disclose adverse facts known to them or recklessly disregarded by them about Verifone. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Verifone stock succeeded because it (i) deceived the investing public regarding Verifone's financial condition, prospects and business; (ii) artificially inflated the price of Verifone's stock (iii) allowed the Individual Defendants to sell over $62.9 million of their own Verifone stock at artificially inflated prices; and (iv) caused plaintiffs and other members of the Class to purchase Verifone stock at inflated prices.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

14.    At the beginning of the Class Period on March 1, 2007, Verifone announced its financial results for the first fiscal quarter ended Janaury 31, 2007. The press release stated, in part, the following:

### Verifone Reports First Quarter Fiscal 2007 Results

Revenues of $217 Million Grew 61% Due to Lipman Acquisition and Strong International Performance

Record EBITDA, as Adjusted, Margins of 25.7%

EPS, as Adjusted, Increases 54% to 37 Cents

SAN JOSE, Calif. – (BUSINESS WIRE) – March 1, 2007 – Verifone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended January 31, 2007. The Company's first quarter results reflect the November 1, 2006, acquisition of Lipman and, because of the integration of Lipman's products and distribution channels as well as the lack of comparable quarter ends of Verifone and Lipman, are compared to preacquisition results of prior fiscal periods.

Net revenues, for the three months ended January 31, 2007, were $216.6 million, 61% higher than the net revenues of $134.6 million for the comparable period of 2006. The record revenues were driven by the Lipman acquisition and a strong performance internationally.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, were 47.1%, for the three months ended January 31, 2007, compared to 45.6% for the comparable period of 2006. GAAP gross margins for the three months ended January 31, 2007, were 37.6%, compared to 44.3% for the three months ended January 31, 2006, as a result of increased amortization of purchased technology assets and the step-up in inventory.

EBITDA, as adjusted, margins for the three months ended January 31, 2007, expanded for the tenth consecutive quarter and reached a record level of 25.7%, compared to the 21.0% recorded in the three months ended January 31, 2006.

GAAP EPS for the three months ended January 31, 2007, was a loss of ($0.01) per diluted share, compared to $0.20 per diluted share, for the comparable period of fiscal 2006, due to acquisition related charges and a higher GAAP tax rate. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended January 31, 2007, increased 54% to $0.37 per diluted share, compared to $0.24 per diluted share, for the three months ended January 31, 2006.

15.    On March 12, 2007, defendants filed with the SEC Verifone's Form 10-QA, containing the Company's financial results for the first fiscal quarter ended January 31, 2007, signed by the Individual Defendants ("1Q07 Form 10-QA"). The 1Q07 Form 10-QA contained many of the same materially false and misleading statements defendants had made previously relating to the first quarter financial and operational performance of the Company. In addition, the 1Q07 Form 10-QA stated, in part, the following:

**Unaudited Interim Financial Information**

The accompanying consolidated balance sheet as of January 31, 2007 and the consolidated statements of operations and cash flows for the three months ended January 31, 2007 and 2006 are unaudited. These unaudited interim condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and Form

10-Q and Article 10 of Regulation "S-X. In the opinion of the Company's management, the unaudited interim condensed consolidated financial statements have been prepared on the same basis as the annual consolidated financial statements and include all adjustments of a normal recurring nature necessary for the fair presentation of the Company's financial position as of January 31, 2007 and its results of operations and cash flows for the three months ended January 31, 2007 and 2006.

\* \* \*

### Inventories

Inventories are stated at the lower of standard cost or market. Standard costs approximate the first-in, first-out ("FIFO") method. The Company regularly monitors inventory quantities on hand and records write-downs for excess and obsolete inventories based primarily on the Company's estimated forecast of product demand and production requirements. Such write-downs establish a new cost-basis of accounting for the related inventory. Actual inventory losses may differ from management's estimates.

\* \* \*

### Segment Information

The Company is primarily structured in a geographic manner. The Company's Chief Executive Officer has been identified as the Chief Operating Decision Maker ("CODM") as defined by SFAS No. 131, *"Disclosures About Segments of an Enterprise and Related Information."* The CODM reviews consolidated financial information on revenues and gross profit percentage for System Solutions and Services. The CODM also reviews operating expenses, certain of which are allocated to the Company's two segments described below.

The Company operates in two business segments: (1) North America and (2) International. The Company defines North America as the United States and Canada, and International as the countries in which it makes sales outside the United States and Canada.

Net revenues and operating income of each business segment reflect net revenues generated within the segment, standard cost of System Solutions net revenues, actual cost of Services net revenues and expenses that directly benefit only that segment. Corporate revenues and operating income reflect amortization of intangible assets, stock-based compensation, in-process research and development expense, and amortization of the step-up in the fair value of inventories, equipment and improvements and deferred revenue resulting from acquisitions. Corporate income also reflects the difference between the actual and standard cost of System Solutions net revenues and shared operating costs that benefit both segments, predominately research and development expenses and centralized supply chain management.

16.     The 1Q07 Form 10-QA also contained a certification submitted pursuant to Section 906 of The Sarbanes-Oxley Act of 2002, signed by defendants Bergeron and Zwarenstein, respectively, which certified the accuracy of the Company's financial statements, as follows:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

17. On May 29, 2007, Verifone announced its financial results for the second fiscal quarter ended April 30, 2007. This press release stated, in part, the following:

### Verifone Reports Second Quarter Fiscal 2007 Results

Revenues of $217 Million Grew 53% Due to Lipman Acquisition and Resurgent North American Growth

Record EBITDA, as Adjusted, Margins of 26.3%

EPS, as Adjusted, Increases 50% to 39 Cents

SAN JOSE, Calif. – (BUSINESS WIRE) – May 29, 2007 – Verifone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended April 30, 2007.

Net revenues, for the three months ended April 30, 2007, were $217.2 million, 53% higher than the net revenues of $142.2 million for the comparable period of 2006. Verifone's International business increased 97% and Verifone's North America business increased 19%. The significant increase in sales was driven largely by the acquisition of Lipman, which closed November 1, 2006.

\* \* \*

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.1%, for the three months ended April 30, 2007, compared to 45.7% for the comparable period of 2006. GAAP gross margins for the three months ended April 30, 2007, were 41.5%, compared to 44.6% for the three months ended April 30, 2006, as a result of increased amortization of purchased technology assets, the step-up in inventory and stock-based compensation.

\* \* \*

EBITDA, as adjusted, margins for the three months ended April 30, 2007, expanded for the eleventh consecutive quarter and reached a record level of 26.3%, compared to the 21.6% recorded in the three months ended April 30, 2006.

GAAP EPS for the three months ended April 30, 2007, was $0.06 per diluted share, compared to $0.22 per diluted share, for the comparable period of fiscal 2006, due to acquisition related non-cash charges, higher stock-based compensation expense primarily related to the Lipman acquisition and to a significantly higher GAAP tax rate driven by an increase in the valuation allowance related to Lipman. Net

income, as adjusted, which excluded non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and Lipman integration costs, for the three months ended April 30, 2007, increased 50% to $0.39 per diluted share, compared to $0.26 per diluted share, for the three months ended April 30, 2006.

18.    On May 31, 2007, defendants filed with the SEC Verifone's Form 10-Q, containing the Company's financial results for the second fiscal quarter ended April 30, 2007 and signed by the Individual Defendants ("2Q07 Form 10-Q"). The 2Q07 Form 10-Q contained many of the same materially false and misleading statements that defendants had made previously relating to the second quarter financial and operational performance of the Company. The 2Q07 Form 10-Q also contained certifications by defendants Bergeron and Zwarenstein respectively, each of which was virtually identical to those filed in the previous quarter and reproduced above. In addition, the 2Q07 Form 10-Q stated, in part, the following:

### Unaudited Interim Financial Information

The accompanying consolidated balance sheet as of April 30, 2007 and the consolidated statements of operations for the three and six months ended April 30, 2007 and 2006 and consolidated statements of cash flows for the six months ended April 30, 2007 and 2006 are unaudited. These unaudited interim condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and Form 10-Q and Article 10 of Regulation S-X.   In the opinion of the Company's management, the unaudited interim condensed consolidated financial statements have  been prepared on the same basis as the annual consolidated financial statements and include all adjustments of a normal recurring nature necessary for the fair presentation of the Company's financial position as of April 30, 2007 and its results of operations and cash flows for the three months ended April 30, 2007 and 2006, and cash flows for the six months ended April 30, 2007 and 2006.

\* \* \*

### Inventories

Inventories are stated at the lower of standard cost or market.  Standard costs approximate the first-in, first-out ("FIFO") method.  The Company regularly monitors inventory quantities on hand and records write-downs for excess and obsolete inventories based primarily on the Company's estimated forecast of product demand and production requirements. Such write-downs establish a new cost-basis of accounting for the related inventory.  Actual inventory losses may differ from management's estimates.

\* \* \*

*Segment Information*

The Company is primarily structured in a geographic manner. The Company's Chief Executive Officer has been identified as the Chief Operating Decision Maker ("CODM") as defined by SFAS No. 131, "*Disclosures About Segments of an Enterprise and Related Information*." The CODM reviews consolidated financial information on revenues and gross profit percentage for System Solutions and Services. The CODM also reviews operating expenses, certain of which are allocated to the Company's two segments described below.

The Company operates in two business segments: (1) North America and (2) International. The Company defines North America as the United States and Canada, and International as the countries in which it makes sales outside the United States and Canada.

Net revenues and operating income of each business segment reflect net revenues generated within the segment, standard cost of System Solutions net revenues, actual cost of Services net revenues and expenses that directly benefit only that segment. Corporate revenues and operating income reflect amortization of intangible assets, stock-based compensation, in-process research and development expense, and amortization of the step-up in the fair value of inventories, equipment and improvements and deferred revenue resulting from acquisitions. Corporate income also reflects the difference between the actual and standard cost of System Solutions net revenues and shared operating costs that benefit both segments, predominately research and development expenses and centralized supply chain management.

19.    On September 6, 2007, Verifone announced its financial results for the third fiscal quarter ended July 31, 2007. This press release stated, in part, the following:

**Verifone Reports Third Quarter Fiscal 2007 Results**

Record Revenues of $232 Million

Record EBITDA, as Adjusted, Margins of 27.3%

Record EPS, as Adjusted, of 42 Cents, Grew 50%

Record Operating Cash Flow of $43 Million

SAN JOSE, Calif. – (BUSINESS WIRE) – Sept. 6, 2007 – Verifone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended July 31, 2007.

Net revenues, for the three months ended July 31, 2007, were $231.9 million, 57% higher than the net revenues of $147.6 million for the comparable period of 206. Net revenues from Verifone's International business increased 106% while net revenues from Verifone's North America business increased 22%. The significant increase in net revenues was driven largely by the acquisition of Lipman Electronic Engineering Ltd., which closed November 1, 2006.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.2%, for the three months ended July 31, 2007, compared to 45.9% for the comparable period of 2006. GAAP gross margins for the three months ended July 31, 2007, declined to 44.0% from 45.0%

for the three months ended July 31, 2006, primarily as a result of increased amortization of purchased technology assets.

GAAP operating expenses for the three months ended July 31, 2007 were $65.5 million compared to $38.0 million for the comparable period of 2006. This increase was primarily due to the Lipman acquisition and related integration expenses.

EBITDA, as adjusted, margins for the three months ended July 31, 2007, expanded for the twelfth consecutive quarter and reached a record level of 27.3%, compared to the 22.6% recorded in the three months ended July 31, 2006.

GAAP EPS for the three months ended July 31, 2007, was $0.16 per diluted share, compared to $0.24 per diluted share, for the comparable period of fiscal 2006. This decline resulted from acquisition related non-cash charges, higher stock-based compensation expense and a higher GAAP tax rate driven by an increase in the valuation allowance related to the Lipman acquisition. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and Lipman integration costs, for the three months ended July 31, 2007, increased 50% to $0.42 per diluted share, compared to $0.28 per diluted share, for the comparable period in 2006.

20.    On September 7, 2007, defendants filed with the SEC Verifone's Form 10-Q, containing the Company's financial results for the quarter ended July 31, 2007 and signed by the Individual Defendants ("3Q07 Form 10-Q"). The 3Q07 Form 10-Q contained many of the same materially false and misleading statements as defendants had made previously relating to the third quarter financial and operational performance of the Company. The 3Q07 Form 10-Q also contained Sarbanes-Oxley certifications signed by the Individual Defendants which were virtually identical to those filed in the previous quarters and reproduced above. In addition, the 3Q07 Form 10-Q stated, in pertinent part, as follows:

### Unaudited Interim Financial Information

The accompanying consolidated balance sheet as of July 31, 2007 and the consolidated statements of operations for the three and six months ended July 31, 2007 and 2006 and the condensed consolidated statements of cash flows for the nine months ended July 31, 2007 and 2006 are unaudited. These unaudited interim condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and Form 10-Q and Article 10 of Regulation S-X. In the opinion of the Company's management, the unaudited interim condensed consolidated financial statements have been prepared on the same basis as the annual consolidated financial statements and include all adjustments of a normal recurring nature necessary for the fair presentation of the Company's financial position as of July 31, 2007 and its results of operations and cash flows for the three and nine months ended July 31, 2007 and 2006, and cash flows for the nine months ended July 31, 2007 and 2006.

*   *   *

*Inventories*

Inventories are stated at the lower of standard cost or market. Standard costs approximate the first-in, first-out ("FIFO") method. The Company regularly monitors inventory quantities on hand and records write-downs for excess and obsolete inventories based primarily on the Company's estimated forecast of product demand and production requirements. Such write-downs establish a new cost-basis of accounting for the related inventory. Actual inventory losses may differ from management's estimates.

\* \* \*

*Segment Information*

The Company is primarily structured in a geographic manner. The Company's Chief Executive Officer has been identified as the Chief Operating Decision Maker ("CODM") as defined by SFAS No. 131, "*Disclosures About Segments of an Enterprise and Related Information.*" The CODM reviews consolidated financial information on revenues and gross profit percentage for System Solutions and Services. The CODM also reviews operating expenses, certain of which are allocated to the Company's two segments described below.

The Company operates in two business segments: (1) North America and (2) International. The Company defines North America as the United States and Canada, and International as the countries in which it makes sales outside the United States and Canada.

Net revenues and operating income of each business segment reflect net revenues generated within the segment, standard cost of System Solutions net revenues, actual cost of Services net revenues and expenses that directly benefit only that segment. Corporate revenues and operating income reflect amortization of intangible assets, stock-based compensation, in-process research and development expense, and amortization of the step-up in the fair value of inventories, equipment and improvements and deferred revenue resulting from acquisitions. Corporate income also reflects the difference between the actual and standard cost of System Solutions net revenues and shared operating costs that benefit both segments, predominately research and development expenses and centralized supply chain management.

21. The statements set forth above were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such. At all times during the Class Period, defendants had misrepresented Verifone's pre-tax profit, in violation of GAAP, by improperly valuing in-transit inventory and allocating manufacturing and distribution overhead to inventory. In doing so, defendants materially overstated Verifone's inventories and understated Verifone's cost of net revenues. At all times during the Class Period, Verifone's financial results were inaccurate and inherently unreliable.

# THE TRUTH EMERGES

22.     On December 3, 2007, defendants announced that the Company had concluded that its financial statements for the first three quarters of fiscal year 2007 would be restated and should no longer be relied upon, as follows:

### Verifone Announces Anticipated Restatement of 2007 Quarterly Financial Statements

Also Announces Preliminary Fourth Quarter 2007 Revenue Results and

Delays Announcement of Fourth Quarter 2007 Financial Results

SAN JOSE, Calif. – (BUSINESS WIRE) – Dec. 3, 2007 – Verifone Holdings, Inc. (NYSE: PAY) today announced that following a review by and on the recommendation of management, it has concluded that its unaudited interim consolidated financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007, and the three and nine months ended July 31, 2007, should no longer be relied upon, principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects Verifone's reported costs of net revenues. The restatements are anticipated to correct errors that overstated previously reported inventories in material amounts as of January 31, 2007, April 30, 2007, and July 31, 2007, and understated cost of net revenues in material amounts for the three months ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly, investors are cautioned not to rely on Verifone's historical financial statements and earnings press releases and similar communications for the periods ended January 31, 2007, April 30, 2007, and July 31, 2007.

Based on its review to date, management currently anticipates that the restatement will result in reductions to previously reported inventories of approximately $7.7 million, $16.5 million and $30.2 million as of January 31, 2007, April 30, 2007, and July 31, 2007, respectively, and reductions to previously reported pre tax income of approximately $8.9 million, $7.0 million and $13.8 million for the three month periods ended January 31, 2007, April 30, 2007, and July 31, 2007, respectively. Verifone is currently evaluating the anticipated effect of the restatement on after-tax income for those periods.

These estimates include corrections of other unrelated errors detected in the course of Verifone's review to date, are based on currently available information and are subject to change during the course of the company's restatement process. While Verifone is not currently aware of other accounting errors requiring adjustment to any prior period financial statements, there can be no assurances that Verifone or its independent registered public accounting firm will not find additional accounting errors requiring further adjustments in those or earlier periods.

\*     \*     \*

Verifone concluded that a restatement of its interim unaudited financial statements is required as a result of an internal review of in-transit inventory balances conducted in preparation for Verifone's fiscal 2007 audit. In reaching the conclusion to restate its financial results, Verifone's management and the Audit

Committee discussed the matters described in this press release with Verifone's independent registered public accounting firm.

Upon completion of its assessment of these errors, Verifone intends to file amended Quarterly Reports on Form 10-Q for the periods described above that will restate the previously issued financial statements included therein. Verifone currently estimates that it will file these amended quarterly reports, together with its Annual Report on Form 10 K for the fiscal year ended October 31, 2007, in January 2008. However, Verifone cannot be certain how much time will ultimately be required for it to complete the restatement process.

23.     Following the publication of this release, which indicated that defendants had overstated previously reported inventories and understated cost of net revenues in material amounts, shares of Verifone plummeted, falling over 45% in a single trading day from a closing price of $48.03 on November 30, 2007 to close at $26.03 on December 3, 2007, on huge trading volume of over 49 million shares or nearly 35 times its average trading volume. Wedbush Morgan analyst Gil Luria called Verifone's announcement "pretty severe," noting that Verifone made no assurances that the Company, or its outside accountants, would not find more mistakes in its financial reporting. Tien-tsin Huang, an analyst at JP Morgan Securities also commented, "The restatement calls into question Verifone's gross margins, which up until now have been positive fuel for the stock."

24.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company's financial statements were materially misstated due to its failure to properly account for its inventory and other items in violation of GAAP; and

(b)     The Company lacked requisite internal controls, and, as a result, the Company's reported results issued during the Class Period were based upon defective assumptions and/or manipulated facts.

25.     As a result of defendants' false statements, Verifone's stock traded at inflated levels during the Class Period. However, after the above revelations were made, the Company's shares plummeted, falling approximately 45% on December 3, 2007.

## VERIFONE'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

26.     In order to inflate the price of Verifone's stock, defendants caused the Company to falsely report its results for the first three quarters of 2007 through improper accounting entries,

1  which materially overstated the Company's inventories and materially understated costs of net

2  revenues. The Company has admitted that its financial statements for the first three quarters of

3  2007 should not be relied upon.

4      27.     The results for the first three quarters of 2007 were included in Form 10-Qs filed

5  with the SEC. The results were also included in press releases and other reports disseminated to

6  the public.

7      28.     Verifone has admitted that it improperly accounted for its inventories and costs of

8  net revenues, that it will have to restate its results and that its financial statements for the first three

9  quarters of 2007 were not a fair presentation of Verifone's results and were presented in violation

10  of GAAP and SEC rules.

11      29.     GAAP are those principles recognized by the accounting profession as the

12  conventions, rules and procedures necessary to define accepted accounting practice at a particular

13  time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with

14  the SEC which are not prepared in compliance with GAAP are presumed to be misleading and

15  inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial

16  statements must also comply with GAAP, with the exception that interim financial statements need

17  not include disclosure which would be duplicative of disclosures accompanying annual financial

18  statements. 17 C.F.R. § 210.10-01(a).

19      30.     The fact that Verifone will restate its financial statements for the first three quarters

20  of 2007 and that such financial statements should no longer be relied upon is an admission that the

21  financial statements originally issued were false. Defendants admitted that the overstatement of

22  inventories and understatement of costs of net revenue were material. Pursuant to GAAP, as set

23  forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced

24  by Verifone was to correct for material errors in its previously issued financial statements. *See* APB

25  No. 20, ¶¶ 7-13. Moreover, FASB Statement of Financial Accounting Standard ("SFAS") No. 154,

26  *Accounting Changes and Error Corrections*, ¶ 25, states: "Any error in the financial statements of

27  a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment

28  by restating the prior-period financial statements." Thus, GAAP provides that financial statements

1    should be restated in order to correct an error in previously issued financial statements. Verifone's

2    restatements are due to an error and the restatements are an admission by Verifone that its

3    previously issued financial results and its public statements regarding those results were false.

4         31.    Due to these accounting improprieties, the Company presented its financial results

5    and statements in a manner which violated GAAP, including the following fundamental accounting

6    principles:

7         (a)    The principle that interim financial reporting should be based upon the same

8    accounting principles and practices used to prepare annual financial statements was violated (APB

9    No. 28, ¶ 10);

10        (b)    The principle that financial reporting should provide information that is

11   useful to present and potential investors and creditors and other users in making rational investment,

12   credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34;

13        (c)    The principle that financial reporting should provide information about the

14   economic resources of an enterprise, the claims to those resources, and effects of transactions,

15   events and circumstances that change resources and claims to those resources was violated (FASB

16   Statement of Concepts No. 1, ¶ 40);

17        (d)    The principle that financial reporting should provide information about how

18   management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

19   for the use of enterprise resources entrusted to it was violated.  To the extent that management

20   offers  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

21   accountability to prospective investors and to the public in general (FASB Statement of Concepts

22   No. 1, ¶ 50);

23        (e)    The principle that financial reporting should provide information about an

24   enterprise's financial performance during a period was violated.  Investors and creditors often use

25   information about the past to help in assessing the prospects of an enterprise.  Thus, although

26   investment and credit decisions reflect investors' expectations about future enterprise performance,

27   those expectations are commonly based at least partly on evaluations of past enterprise performance

28   (FASB Statement of Concepts No. 1, ¶ 42);

1    (f)    The principle that financial reporting should be reliable in that it represents

2  what it purports to represent was violated. That information should be reliable as well as relevant

3  is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

4    (g)    The principle of completeness, which means that nothing is left out of the

5  information that may be necessary to insure that it validly represents underlying events and

6  conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

7    (h)    The principle that conservatism be used as a prudent reaction to uncertainty

8  to try to ensure that uncertainties and risks inherent in business situations are adequately considered

9  was violated. The best way to avoid injury to investors is to try to ensure that what is reported

10  represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

11    32.    Further, the undisclosed adverse information concealed by defendants during the

12  Class Period is the type of information which, because of SEC regulations, regulations of the

13  national stock exchanges and customary business practice, is expected by investors and securities

14  analysts to be disclosed and is known by corporate officials and their legal and financial advisors

15  to be the type of information which is expected to be and must be disclosed.

16    **LOSS CAUSATION/ECONOMIC LOSS**

17    33.    By misrepresenting Verifone's financial condition, the defendants presented a

18  misleading picture of Verifone's business and prospects. Thus, instead of truthfully disclosing

19  during the Class Period Verifone's financial condition, Verifone falsely reported its financial results

20  and its actual business prospects going forward.

21    34.    These false statements about Verifone's financial condition caused and maintained

22  the artificial inflation in Verifone's stock prices throughout the Class Period and until the truth was

23  revealed to the market.

24    35.    Defendants' false and misleading statements had the intended effect and caused

25  Verifone stock to trade at artificially inflated levels throughout the Class Period.

26    36.    On December 3, 2007, Verifone announced material overstatement of inventories

27  and material understatement of costs of net revenues, requiring restatement of the Company's

28  financial statements for the first three quarters of 20 07. This announcement directly and

1    proximately caused Verifone's stock to decline from $48.03 per share on November 30, 2007 to

2    $26.03 per share on December 3, 2007 – a one-day decline of over 45%. This drop in price

3    removed the inflation from Verifone's stock prices, causing real economic loss to investors who had

4    purchased the stock during the Class Period.

5    **ADDITIONAL SCIENTER ALLEGATIONS**

6    37.    As alleged herein, defendants acted with scienter in that each defendant knew that

7    the public documents and statements issued or disseminated in the name of the Company were

8    materially false and misleading; knew that such statements or documents would be issued or

9    disseminated to the investing public; and knowingly and substantially participated or acquiesced

10    in the issuance or dissemination of such statements or documents as primary violations of the

11    federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt

12    of information reflecting the true facts regarding Verifone, their control over, and/or receipt and/or

13    modification of Verifone's allegedly materially misleading misstatements and/or their associations

14    with the Company which made them privy to confidential proprietary information concerning

15    Verifone, participated in the fraudulent scheme alleged herein.

16    38.    In addition, throughout the Class Period, while in possession of material adverse

17    non-public information, defendants were motivated to materially misrepresent to the SEC and

18    investors the true financial condition of the Company in order to obtain over $62.9 million in total

19    proceeds from sales of their own Verifone stock. These insider sales are set forth below:

20    **Defendant Douglas G. Bergeron**

| Transaction Date | Shares Sold | Share Price | Proceeds |
|---|---|---|---|
| 3/15/07 | 19,700 | 36.10 | $ 714,519 |
| 3/15/07 | 69,613 | 35.92 | $2,512,681 |
| 3/15/07 | 110,687 | 35.83 | $3,975,401 |
| 4/11/07 | 24,000 | 37.50 | $ 907,243 |
| 5/10/07 | 21,671 | 38.07 | $ 830,866 |
| 5/10/07 | 28,164 | 37.97 | $1,072,204 |
| 5/10/07 | 47,600 | 37.78 | $1,806,896 |
| 5/14/07 | 88,100 | 37.78 | $3,346,919 |
| 6/12/07 | 63,800 | 32.65 | $2,096,468 |
| 6/12/07 | 40,100 | 32.43 | $1,308,864 |
| 6/12/07 | 46,100 | 32.87 | $1,525,910 |
| 7/12/07 | 47,950 | 36.61 | $1,767,437 |
| 7/12/07 | 37,300 | 36.87 | $1,380,100 |
| 7/12/07 | 71,450 | 36.49 | $2,615,070 |

| | | | |
|---|---|---|---|
| 7/12/07 | 43,300 | 36.31 | $1,579,584 |
| 8/10/07 | 83,700 | 39.05 | $3,276,855 |
| 9/10/07 | 31,200 | 39.18 | $1,228,968 |
| 9/10/07 | 86,300 | 38.73 | $3,358,796 |
| 9/10/07 | 82,500 | 38.93 | $3,231,525 |
| 10/10/07 | 69,700 | 45.73 | $3,208,291 |
| 10/10/07 | 43,200 | 45.13 | $1,965,168 |
| 10/10/07 | 17,300 | 46.04 | $   805,488 |
| 10/10/07 | 3,300 | 45.67 | $   150,711 |
| 10/10/07 | 66,600 | 45.50 | $3,040,526 |
| 11/14/07 | 41,398 | 44.95 | $1,872,432 |
| 11/14/07 | 47,197 | 44.70 | $2,121,222 |
| 11/14/07 | 28,682 | 45.25 | $1,305,031 |
| 11/14/07 | 4,925 | 45.81 | $   226,304 |
| 11/14/07 | 18,293 | 45.51 | $   837,819 |
| 11/19/07 | 14,405 | 44.70 | $   647,217 |
| 11/26/07 | 4,100 | 44.06 | $   190,363 |
| 11/26/07 | 6,800 | 45.59 | $   313,140 |
| 11/26/07 | 12,500 | 45.11 | $   569,750 |
| 11/26/07 | 19,900 | 44.49 | $   897,490 |
| **Total Shares Sold:** | **1,441,435** | **Total Proceeds:** | **$56,687,258** |

### Defendant Barry Zwarenstein

| Transaction Date | Shares Sold | Share Price | Proceeds |
|---|---|---|---|
| 3/15/07 | 12,600 | 35.75 | $   453,348 |
| 3/15/07 | 5,400 | 36.00 | $   195,588 |
| 4/10/07 | 12,215 | 37.87 | $   464,659 |
| 4/10/07 | 5,785 | 37.48 | $   219,090 |
| 5/8/07 | 8,200 | 37.14 | $   308,148 |
| 5/8/07 | 9,700 | 37.58 | $   367,436 |
| 6/12/07 | 6,300 | 32.88 | $   207,900 |
| 6/12/07 | 11,700 | 32.50 | $   384,684 |
| 7/10/07 | 8,200 | 36.07 | $   298,152 |
| 7/10/07 | 9,800 | 36.37 | $   360,248 |
| 8/14/07 | 9,700 | 36.79 | $   363,944 |
| 8/14/07 | 8,300 | 36.35 | $   305,274 |
| 9/11/07 | 9,000 | 39.81 | $   359,892 |
| 9/11/07 | 9,000 | 39.00 | $   358,281 |
| 10/9/07 | 3,700 | 45.01 | $   169,190 |
| 10/9/07 | 4,800 | 44.72 | $   216,043 |
| 10/9/07 | 5,100 | 44.08 | $   228,021 |
| 10/9/07 | 4,400 | 43.45 | $   200,244 |
| 11/13/07 | 9,222 | 44.38 | $   422,829 |
| 11/13/07 | 8,778 | | $   389,480 |
| **Total Shares Sold:** | **161,900** | **Total Proceeds:** | **$6,272,450** |

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

39.    At all relevant times, the market for Verifone's stock was an efficient market for the following reasons, among others:

1                    (a)        Verifone's stock met the requirements for listing, and was listed and actively

2    traded on the NYSE, a highly efficient and automated market;

3                    (b)        As a regulated issuer, Verifone filed periodic public reports with the SEC and

4    the NYSE;

5                    (c)        Verifone regularly communicated with public investors via established

6    market communication mechanisms, including through regular disseminations of press releases on

7    the national circuits of major newswire services and through other wide-ranging public disclosures,

8    such as communications with the financial press and other similar reporting services; and

9                    (d)        Verifone was followed by numerous securities analysts employed by major

10   brokerage firm(s), including Wedbush Morgan, Credit Suisse, Morgan Keenan, Wachovia, JP

11   Morgan, CSFB, Lehman Brothers, and Prudential, who wrote reports which were distributed to the

12   sales force and certain customers of their respective brokerage firm(s). Each of these reports was

13   publicly available and entered the public marketplace.

14          40.       As a result of the foregoing, the market for Verifone stock promptly digested current

15   information regarding Verifone from all publicly available sources and reflected such information

16   in the price of Verifone's stock. Under these circumstances, all purchasers of Verifone stock during

17   the Class Period suffered similar injury through their purchase of Verifone stock at artificially

18   inflated prices and a presumption of reliance applies.

19                                                **NO SAFE HARBOR**

20          41.       The statutory safe harbor provided for forward-looking statements under certain

21   circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

22   Many of the specific statements pleaded herein were not identified as "forward-looking statements"

23   when made. To the extent there were any forward-looking statements, there were no meaningful

24   cautionary statements identifying important factors that could cause actual results to differ

25   materially from those in the purportedly forward-looking statements. Alternatively, to the extent

26   that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

27   defendants are liable for those false forward-looking statements because at the time each of those

28   forward-looking statements was made, the speaker knew that the forward-looking statement was

1 | false, and/or the forward-looking statement was authorized and/or approved by an executive officer

2 | of Verifone who knew that those statements were false when made.

3 | **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

4 | 42.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

5 | Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of the common stock

6 | of Verifone between March 1, 2007 and November 30, 2007, inclusive (the "Class") and who were

7 | damaged thereby.  Excluded from the Class are defendants, the officers and directors of the

8 | Company, at all relevant times, members of their immediate families and their legal representatives,

9 | heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

10 | 43.    The members of the Class are so numerous that joinder of all members is

11 | impracticable.  Throughout the Class Period, Verifone common shares were actively traded on the

12 | New York Stock Exchange.  As of August 24, 2007, the Company had over 83 million shares

13 | issued and outstanding.  While the exact number of Class members is unknown to plaintiffs at this

14 | time and can only be ascertained through appropriate discovery, plaintiffs believe that there are

15 | hundreds or thousands of members in the proposed Class.  Record owners and other members of

16 | the Class may be identified from records maintained by Verifone or its transfer agent and may be

17 | notified of the pendency of this action by mail, using the form of notice similar to that customarily

18 | used in securities class actions.

19 | 44.    Plaintiffs' claims are typical of the claims of the members of the Class as all

20 | members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

21 | law that is complained of herein.

22 | 45.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

23 | and has retained counsel competent and experienced in class and securities litigation.

24 | 46.    Common questions of law and fact exist as to all members of the Class and

25 | predominate over any questions solely affecting individual members of the Class.  Among the

26 | questions of law and fact common to the Class are:

27 | (a)    whether the federal securities laws were violated by defendants' acts as

28 | alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial results of Verifone; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

47.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

48.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

49.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did (i) deceive the investing public, including plaintiffs an d other Class members, as alleged herein; (ii) enable the Individual Defendants to sell more than $62.9 million of their own Verifone common stock to the unsuspecting public; and (iii) cause plaintiffs and other members of the Class to purchase Verifone stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

50.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Verifone's stock in violation of Section 10(b) of the Exchange Act and Rule

1  10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct

2  charged herein or as controlling persons as alleged below.

3        51.    Defendants, individually and in concert, directly and indirectly, by the use, means

4  or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

5  continuous course of conduct to conceal adverse material information about the business, operations

6  and prospects of Verifone as specified herein.

7        52.    These defendants employed devices, schemes and artifices to defraud, while in

8  possession of material adverse non-public information, and engaged in acts, practices, and a course

9  of conduct as alleged herein in an effort to assure investors of Verifone's value and performance

10  and continued substantial growth, which included the making of, or the participation in the making

11  of, untrue statements of material facts and omitting to state material facts necessary in order to make

12  the statements made about Verifone and its business operations and financial condition in the light

13  of the circumstances under which they were made, not misleading, as set forth more particularly

14  herein, and engaged in transactions, practices and a course of business which operated as a fraud

15  and deceit upon the purchasers of Verifone stock during the Class Period.

16        53.    Each of the Individual Defendants' primary liability, and controlling person liability,

17  arises from the following facts: (i) the Individual Defendants were high-level executives and/or

18  directors at the Company during the Class Period and members of the Company's management

19  team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and

20  activities as a senior officer and/or director of the Company, was privy to and participated in the

21  creation, development and reporting of the Company's financial statements, projections and/or

22  reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the

23  other defendants and was advised of and had access to other members of the Company's

24  management team, internal reports and other data and information about the Company's finances

25  and operations at all relevant times; and (iv) each of these defendants was aware of the Company's

26  dissemination of information to the investing public which they knew or recklessly disregarded was

27  materially false and misleading.

28

54.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Verifone's financial condition and business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's financial condition throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Verifone stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Verifone's stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class purchased Verifone stock during the Class Period at artificially high prices and were damaged thereby.

56.     At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding Verifone's financial condition, which was not disclosed by defendants, plaintiffs and other members of the Class would not have purchased their Verifone stock, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

### SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against Individual Defendants

59.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of Verifone within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, Verifone and the Individual Defendants each violated Section 10(b) and rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiffs and

1  other members of the Class suffered damages in connection with their purchases of the Company's

2  stock during the Class Period.

3      **WHEREFORE**, plaintiffs pray for relief and judgment as follows:

4      A.      Determining that this action is a proper class action;

5      B.      Awarding compensatory damages in favor of plaintiffs and the other Class members

6  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

7  wrongdoing, in an amount to be proven at trial, including interest thereon;

8      C.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in

9  this action, including counsel fees and expert fees; and

10     D.      Such other and further relief as the Court may deem just and proper.

11                      **JURY TRIAL DEMANDED**

12     Plaintiffs hereby demand a trial by jury.

13  Dated: December 7, 2007                  Respectfully submitted,

14                                  **BERMAN DeVALERIO PEASE**
                                    **TABACCO BURT & PUCILLO**
15
                                    By: _____
16                                              Nicole Lavallee

17                                  Joseph J. Tabacco, Jr. (SBN 75484)
                                    425 California Street, Suite 2100
18                                  San Francisco, CA 94104
                                    Tel.: (415) 433-3200
19                                  Fax: (415) 433-6382
                                    Email: nlavallee@bermanesq.com
20                                  Sherrie R. Savett
                                    Barbara A. Podell
21                                  Arthur Stock
                                    Phyllis M. Parker
22                                  **BERGER & MONTAGUE, P.C.**
                                    1622 Locust Street
23                                  Philadelphia, PA 19103
                                    Tel.: (215) 875-3000
24                                  Fax: (215) 875-4604
                                    Email: ssavett@bm.net
25                                  Email: bpodell@bm.net
                                    Email: astock@bm.net
26                                  Email: pparker@bm.net

27                                  *Attorneys for Plaintiffs Albert L. Feldman*
                                    *and Eleanor Jean Feldman*
28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                      25

## VERIFONE HOLDINGS, INC.
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Albert L. and Eleanor Jean Feldman ("Plaintiffs"), do hereby duly swear and say, as to the claims asserted under the federal securities laws, that:

1.    Plaintiffs have reviewed a complaint against Verifone Holdings, Inc. ("Verifone") and certain of its officers and directors, approve of its contents, and authorize their selected counsel, Berger & Montague, P.C., to file the complaint and/or lead plaintiff papers on their behalf.

2.    Plaintiffs did not purchase the securities that are the subject of this action at the direction of their counsel or in order to participate in this private action.

3.    Plaintiffs are willing to serve as representative parties on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiffs' transactions in the securities of Verifone between and including March 1, 2007 and November 30, 2007, inclusive (the "Class Period"), are as follows:

| Securities Purchased (Shares of Common Stock) | Date of Purchase | Price per Security |
|---|---|---|
| 200 | 10/17/2007 | $46.12990 |
| 400 | 11/28/2007 | $46.49990 |

5.    Plaintiffs have not sought to serve as representative parties in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

6.    Plaintiffs have not accepted and will not accept any payment for serving as representative parties on behalf of the class beyond their pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _7_ day of _DECEMBER_ 2007.

By: _____
Albert L. Feldman

By: _____
Eleanor Jean Feldman