United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re VERIFONE HOLDINGS, INC. SECURITIES LITIGATION.
_____________________________________/

This document relates to: ALL ACTIONS.
_____________________________________/

No. C 07-6140 MHP

**MEMORANDUM & ORDER**

**Re: Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint**

This consolidated litigation represents nine securities fraud class actions filed against VeriFone Holdings, Inc. ("VeriFone") and certain of its officers and directors (collectively "defendants"), on behalf of purchasers of VeriFone common stock between August 30, 2006 and April 1, 2008. Now before the court is defendants' motion to dismiss the third amended complaint ("TAC"). Having considered the arguments and submissions of the parties, the court enters the following memorandum and order.

BACKGROUND

VeriFone is a Delaware corporation with its principal place of business in San Jose, California. It engages in the design, marketing and service of transaction automation systems, including point-of-sale devices that enable secure electronic payments among consumers, merchants and financial institutions. Its main customers include global financial institutions, payment processors, large retailers, government organizations and healthcare companies. On November 1, 2006, VeriFone acquired Lipman Electronic Engineering Ltd. ("Lipman"), an Israeli-based developer, manufacturer and seller of electronic payment systems and software. At the time of the

United States District Court
For the Northern District of California

acquisition, Lipman was the fourth-largest point-of-sale terminal maker in the world. The acquisition of Lipman made VeriFone the largest global provider of electronic payment solutions and services in the world.

On December 3, 2007, VeriFone shareholders learned, via a company press release, that the company would restate its quarterly financial statements for at least the previous three quarters, to correct errors that overstated previously reported profits. VeriFone publicly announced that its consolidated financial statements for the quarters ending January 31, 2007, April 30, 2007 and July 31, 2007 should not be relied upon due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affected VeriFone's reported costs of net revenues. These accounting errors were caused by manual adjustments made by Paul Periolat, VeriFone's supply chain controller. The restatement resulted in reductions to net revenue of approximately $7.7 million, $11.5 million and $8.4 million as of the quarters ending January 31, 2007 ("1Q07"), April 30, 2007 ("2Q07") and July 31, 2007 ("3Q07"), respectively, and reductions to previously reported income of approximately $11.8 million (to a net loss of $602,000), $10.2 million and $14.7 million for these three quarters, respectively. Cumulatively, operating income for the three quarters fell from $65.6 million to $28.6 million, or an overstatement of 129%. The day of the press release, December 3, 2007, shares of VeriFone dropped from $48.03 to $26.03-a decline of over 45%-with over 49 million shares traded.

VeriFone's public announcement of the overstatement exposed the company to both litigation and regulatory investigations. The following day, December 4, 2007, a securities class action was filed in the Northern District of California, asserting securities fraud claims against VeriFone and certain officers and directors. Pursuant to 15 U.S.C. section 78u-4(a)(3)(A)(I), the first notice that a class action had been initiated against defendants was published on the same day. Eight other lawsuits followed, and the cases were related and thereafter consolidated before this court in this action as *In re VeriFone Holdings Inc. Securities Litigation*, C-07-6140 MHP. The consolidated complaint was filed on October 31, 2008, and was dismissed, with leave to amend, on May 26, 2009.

On September 1, 2009, the SEC filed a complaint against VeriFone and Periolat. Docket No. 214 (Second Amended Complaint ("SAC"), Exh. 2 (SEC complaint). According to the SEC complaint, VeriFone relied on gross margin as an indicator of its profitability and routinely provided forecasts of its quarterly gross margins to investment analysts who followed the company. As VeriFone's former supply chain controller, Paul Periolat's responsibilities included forecasting VeriFone's annual and quarterly gross margins as well as monitoring and updating the forecast throughout the year. Periolat was also responsible for making final inventory-related valuation adjustments, such as royalties, warranty reserves and reserves for obsolete inventory.

The SEC alleged that VeriFone's overstated operating income was principally the result of erroneous inventory accounting adjustments made by Periolat. Periolat made the unsupportable adjustments after VeriFone's internal reporting showed preliminary quarterly results substantially lower than expected. As a result of Periolat's subsequent accounting adjustments, VeriFone was able to announce final quarterly results in line with its previous public forecasts. Periolat ignored information that indicated that his adjustments were incorrect, and repeatedly failed to confirm his adjustments with others at VeriFone who would have realized the adjustments were incorrect. As a result, each quarter Periolat made millions of dollars in incorrect adjustments to VeriFone's inventory accounting records without having the adjustments scrutinized or approved by more senior VeriFone management.

At the end of each quarter, VeriFone prepared internal reports of its preliminary financial results, which were distributed to the company's finance personnel for verification. In early February 2007, during the quarterly close process for the quarter ending January 31, 2007, the internal preliminary results showed a gross margin of four percentage points below Periolat's internal forecast and the Company's guidance to analysts. Periolat and others were charged with determining why there was such a large discrepancy. Accordingly, Periolat and others focused on the cost of goods sold ("COGS") and inventory accounting to determine the reason for the variance.

With no answer forthcoming, VeriFone's chief executive officer, Douglas Bergeron, and then-chief financial officer, Barry Zwarenstein, began to express increasing frustration. They sent

United States District Court
For the Northern District of California

emails characterizing the low gross margin as an "unmitigated disaster" and instructed management to "figure it [and related low results] out." In addition, Periolat and others were provided with analyses which laid out the relation between specific reductions in COGS and the corresponding increase in gross margin.

Shortly thereafter, Periolat determined that the problem with the gross margin had been caused by incorrect accounting for inventory by a foreign subsidiary. Periolat then calculated adjustments which manually increased inventory by approximately $7 million, which led to an increase in VeriFone's gross margin to approximately 47.5%. Periolat, however, failed to take adequate steps to verify that his inventory accounting adjustment was appropriate. Among other things, Periolat failed to confirm his adjustments with the foreign subsidiary's controller. Had he done so, Periolat would have learned that the subsidiary had reported its inventory correctly. Moreover, Periolat had been aware before making the adjustments that the subsidiary had proper procedures in place for accounting for inventory. Periolat also learned a month after 1Q07 closed that the subsidiary had correctly accounted for inventory at least through the end of the last fiscal year, putting him on notice that his adjustments may have been incorrect. Nonetheless, Periolat did not take steps to verify or correct his prior inventory adjustments.

VeriFone filed its Form 10-Q for the first quarter official year 2007 on March 9, 2007. As a result of the false accounting adjustments, VeriFone reported inaccurate inventory results and overstated its net income by approximately $12.4 million. VeriFone also announced to the market that it had achieved a 47.1% gross margin, in line with management's previous guidance of the "long term model of 42% to 47%."

As had happened at the close of the first quarter, during the second and third quarterly close process, VeriFone's internal preliminary results also reflected lower gross margins than the company's forecasts for both the second and third quarters. At the end of the second quarter, Periolat determined that the reason for the lower-than-expected gross margin was a failure to properly account for in-transit inventory, a category of inventory reflecting inventory shipped overseas from a VeriFone subsidiary or manufacturer but not yet received in the United States. Based on shipping

United States District Court
For the Northern District of California

and receiving information, Periolat incorrectly determined that there was a gap between inventory that had been shipped and inventory that been received of approximately $10.6 million. After seeking and receiving positive feedback from a subordinate in his department, Periolat gave his calculations to another subordinate to prepare a manual journal voucher which would be used to make manual adjustments to VeriFone's corporate records. Periolat then signed the vouchers as a "reviewer." Periolat repeated the process in the third quarter, calculating purported "in-transit" inventory to be manually adjusted by a subordinate and then "reviewing" and approving the adjustment. For the second and third quarters combined, he authorized approximately $20 million of increases to inventory. Doing so had the effect of decreasing COGS by a corresponding amount and thus increasing the gross margins.

According to the SEC, there was no reasonable basis for the manual entries. Periolat's adjustments relied on an unfounded assumption that goods were in transit between VeriFone's international headquarters and the United States. However, goods were never actually shipped between the international headquarters and the United States and as a result could not have been "in transit." Moreover, senior management was aware of Periolat's adjustments but never questioned them. Nor did senior management question the forecasts for the second and third quarters; instead, they simply assumed the preliminary actual results were wrong when they differed from the forecasts. In addition, despite monthly reports showing a sharp and unprecedented increase in inventory as a result of Periolat's adjustments, senior managers never questioned the increases. As a result of Periolat's adjustments, VeriFone falsely met its internal forecasts and the guidance provided to analysts for the second and third quarters of fiscal 2007.

The accounting irregularities came to light in late November 2007 during the annual audit. Periolat was unable to explain his adjustments and ultimately concluded that they were wrong. He then reported the problem to senior management. On December 3, 2007, VeriFone announced that its financials for the last three quarters would need to be restated. That day, the company's share price dropped from the previous close of $48.03 to $26.03, or an approximately 46% drop. The drop amounted to a loss of approximately $1.8 billion in market capitalization. On August 19, 2008,

VeriFone issued restated financials for the first three quarters of its fiscal 2007 year. For the first quarter, in addition to other adjustments, the company recorded an increase of $7.7 million to the total cost of net revenues as a result of Periolat's overhead adjustments. This contributed to an overall decrease in the operating income from $11.8 million to a loss of $602,000. Similarly, in the second and third quarters, the company reported an increase of $11.5 million and $8.4 million, respectively, in the total cost of net revenues, in order "to eliminate intercompany in-transit inventory that did not exist." As a result of these and other adjustments, VeriFone's operating income dropped from $17.7 million to $7.5 million for the second quarter, and from $36.5 million to $21.8 million for the third. Cumulatively, operating income for the three quarters fell from $65.6 million to $28.6 million, or an overstatement of 129%.

On November 12, 2009, Judge Seeborg endorsed the parties' stipulation and entered final judgment as between Periolat and the SEC. Docket No. 234 (Strauss Dec.), Exh. A (SEC Judgment) at 8. Periolat agreed to pay $25,000, with no admission of liability over his role in "incorrectly determin[ing]," "fail[ing] to take adequate steps to verify" and "relying on an unfounded assumption" in making inventory accounting adjustments at VeriFone during the first three quarters of 2007. *Id.* at 4-5, 7. The SEC has also issued a Litigation Release, of which the court takes judicial notice. SAC, Exh. 1 (Litigation Release). The release states, based upon the facts alleged by the SEC complaint, that VeriFone's senior management had instructed Periolat to "fix the problem" so that VeriFone could meet its "guidance to investors." *Id.*

On January 19, 2010, plaintiffs filed their SAC. On March 5, 2010, defendants VeriFone Systems, Inc., William Atkinson, Craig Bondy, Douglas Bergeron, Paul Periolat and Barry Zwarenstein filed motions to dismiss plaintiffs' SAC. The motions were fully briefed and oral argument was held on May 17, 2010, however plaintiffs filed an unopposed motion for leave to file a TAC in order to include new evidence allegedly revealed in transcripts of testimony related to the SEC investigation. Docket No. 250 (Motion for Leave) at 2. The court granted plaintiffs' motion and on September 15, 2010, plaintiffs filed their TAC. Docket No. 262 (TAC). Defendants

United States District Court
For the Northern District of California

VeriFone Systems, Inc., William Atkinson, Craig Bondy, Douglas Bergeron, Paul Periolat and Barry Zwarenstein now move to dismiss plaintiffs' TAC.

LEGAL STANDARD

I. Section 10(b)

Under section 10(b) of the Securities and Exchange Act of 1934 ("the Act"), it is unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). One such rule prescribed under the Act is Securities and Exchange Commission ("SEC") Rule 10b-5. This rule provides, among other things, "It shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). Plaintiffs must prove five elements to prevail on a claim asserting a primary violation of Rule 10b-5: 1) a material misrepresentation or omission of fact; 2) scienter; 3) a connection with the purchase or sale of a security; 4) transaction and loss causation; and 5) economic loss. *In re Daou Sys.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

II. Insider Trading

Section 20A of the Act provides that an insider who trades stock while in possession of material, nonpublic information is liable to any person who traded contemporaneously with the insider. *See* 15 U.S.C.A. § 78t-1(a). Insider trading can also be a separate, primary violation under section 10(b). *See* SEC Rule 10b5-1. Such a claim is subject to the section 10(b) pleading requirements discussed below. *See Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1197 (C.D. Cal. 2004) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)). Section 20A claims require proof of a separate underlying violation of the Act. *Id.* at 1194 (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999)).

III. Control Person Liability

United States District Court
For the Northern District of California

Section 20(a) of the Act makes certain "controlling" individuals liable for primary violations of the Act and its underlying regulations. *See* 15 U.S.C. § 78t(a). Without a primary violation of the Act, there is no control liability under section 20(a). *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999).

IV. Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A motion to dismiss should be granted if plaintiffs fail to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 554, 570 (2007); *see Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). "A complaint should not be dismissed unless it appears beyond doubt that the [p]laintiffs can prove no set of facts in support of their claim that would entitle them to relief." *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997). "Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court need not, however, accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), *see* 109 Stat. 737, significantly altered pleading requirements in private securities litigation in order to eliminate meritless claims. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999), *superseded on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). "The PSLRA Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to 'deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (quoting *Ernst & Ernst*, 425 U.S. at 194 & 194 n.12). To meet the first requirement, plaintiffs must: 1) identify each

statement alleged to have been misleading; 2) state the reason or reasons why the statement is misleading; and 3) if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. *See* 15 U.S.C. § 78u-4(b)(1). To meet the scienter requirement, plaintiffs must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Tellabs*, 551 U.S. at 308 (emphasis added).

"To qualify as 'strong' within [the meaning of the statute] . . . an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "When assessing a complaint for compliance with this standard, courts must consider the complaint in its entirety and inquire whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Metzler Investment GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008) (emphasis in original) (citation and internal quotation marks omitted). The pleading standard under the PSLRA is higher than that provided by Federal Rule of Civil Procedure 9(b). *See* Fed. R. Civ. P. 9(b).

In an action predicated on section 10(b), plaintiffs must, to adequately demonstrate that a defendant acted with the required state of mind, allege that the defendant made false or misleading statements either intentionally or with "deliberate recklessness." *Silicon Graphics*, 183 F.3d at 974. Deliberate recklessness is "a form of intentional or knowing misconduct." *Id.* at 976. Indeed, "although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness." *Id.* at 974.

<u>DISCUSSION</u>

The TAC alleges that defendants violated section 10(b) and its implementing regulation SEC Rule 10b-5(a), (b) and (c) by engaging in a scheme to defraud, making false statements, omitting material facts and performing deceptive acts. Plaintiffs must allege and prove six elements

United States District Court
For the Northern District of California

regarding each defendant: 1) a primary violation—fraudulent scheme, material misstatement or deceptive course of conduct; 2) scienter; 3) a connection with the purchase or sale of stock; 4) reliance; 5) loss causation; and 6) economic loss. *Dura Pharms v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants primarily claim that plaintiffs have not adequately alleged scienter. Each defendant in discussed in turn.

I. <u>Periolat</u>

Defendant Paul Periolat was a salaried employee at VeriFone, who worked as a supply-chain controller at the company's satellite facility in Rocklin, California. Although plaintiffs' own witnesses state that Periolat worked in an accounting department that was chaotic, disorganized, understaffed, and that was overwhelmed by the Lipman acquisition, rendering it unable to retrieve accurate financial data from that subsidiary, plaintiffs' allegations present a strong inference that Periolat acted with deliberate recklessness when implementing the manual adjustments.

The deliberate recklessness standard requires plaintiffs to "plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting *Silicon Graphics*, 183 F.3d at 976) (internal quotation marks omitted); *see Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc) (citation omitted) ("[T]he danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even 'white heart/empty head' good faith."). Scienter includes "a subjective inquiry" turning on "the defendant's actual state of mind." *Gebhart v. Sec. & Exchange Comm'n*, 595 F.3d 1034, 1042 (9th Cir. 2010).

According to the SEC complaint, Periolat made the unsupportable adjustments after VeriFone's internal reporting showed preliminary quarterly results substantially lower than expected. Periolat also ignored information that indicated that his adjustments were incorrect, and repeatedly failed to confirm his adjustments with others at VeriFone who would have realized the

adjustments were incorrect. After VeriFone's chief executive officer, Bergeron, and then-chief financial officer, Zwarenstein, sent emails characterizing low gross margins as an "unmitigated disaster" and instructed management to "figure it [and related low results] out," Periolat determined that the discrepancy between the forecast and the preliminary results had been caused by incorrect accounting for inventory by a foreign subsidiary. SEC complaint ¶ 18. Periolat then manually calculated adjustments which increased inventory by approximately $7 million, leading to an increase in VeriFone's gross margin such that it was in line with analyst expectations. Periolat, however, had been aware before making the adjustments that the subsidiary had proper procedures in place for accounting for inventory. Periolat also learned a month after the quarter close that the subsidiary had correctly accounted for inventory at least through the end of the last fiscal year, putting him on notice that his adjustments may have been incorrect. Nonetheless, Periolat did not take steps to verify or correct his prior inventory adjustments.

As had happened at the close of the first quarter, during the second and third quarterly close process, VeriFone's internal preliminary results also reflected lower gross margins than the company's forecasts for both of those quarters. For the second quarter, Periolat manually adjusted inventory to account for $10.6 million in inventory shipped from overseas that was "in-transit" to the United States. He repeated this process for the third quarter ending July 31, 2007, increasing inventory by a total of approximately $20 million. There was, however, no reasonable basis for the manual entries because this inventory was never actually shipped between VeriFone's international headquarters and the United States and as a result could not have been "in transit." In other words, Periolat fabricated "in-transit" inventory that did not exist. Manually adjusting upward this non-existent "in-transit" inventory had the effect of decreasing cost of goods sold (COGS) by a corresponding amount and thus increasing VeriFone's gross margins.

The accounting irregularities came to light in late November 2007 during the annual audit conducted by Ernst and Young ("E & Y"). Periolat was unable to explain his adjustments to E & Y, and he ultimately concluded that they were wrong. He then reported the problem to senior management. Accepting the allegations as true and taking them collectively, they are cogent, but the

court must weigh alternate, non-fraudulent inferences against this inference of culpability. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 273 & n.46 (3d Cir. 2009) ("As [the court] take[s] up each allegation in turn, we have added to it the picture painted by the previously considered allegation and asked: How does this addition affect the relative strengths of the culpable and non-culpable inferences?"); *see Tellabs*, 551 U.S. at 323 ("in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."). The court now turns to inferences that demonstrate a non-fraudulent intent.

Plaintiffs concede that the only motive for Periolat's actions would have been his fear of job loss. Motive is simply another factor in the totality of circumstances. *Id.* at 325 ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference."). Periolat could have understood that making incorrect manual entries could eventually cost him his position; however, he could have also understood that failing to deliver on his projected margin forecast could immediately cost him his position. There are no allegations whatsoever with respect to the latter inference. Moreover, this motive—job preservation—could be imputed to any employee. The most plausible inference with respect to motive, therefore, is that Periolat acted not with scienter, but with belief that his manual corrections were correct. This is further supported by the open and notorious nature of the correction. There was no attempt to conceal the correction, and any VeriFone accountant, including VeriFone's outside auditors, could have verified this adjustment.

The strong inference of scienter that plaintiffs must plead is also undercut by the correctness of Periolat's projections in the past. His track-record may well have convinced him that his manual adjustments were proper. Moreover, Periolat's subsequent departure from VeriFone is not probative either. Termination from a job after a restatement, without some indication that the termination was related to fraud or conscious wrongdoing at VeriFone, does not provide a strong inference of scienter. *See In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) (Patel, J.) ("Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions.").

United States District Court
For the Northern District of California

There is no dispute that Periolat manually adjusted VeriFone's inventory valuations. The issue here is Periolat's state of mind. Plaintiffs present confidential witnesses that purport to speak to Periolat's state of mind. In the Ninth Circuit, confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. *Daou*, 411 F.3d at 1015-16. Consequently, confidential witnesses that simply confirm Periolat's manual adjustments, which are undisputed, without speaking to his intentions from personal knowledge, do not assist in demonstrating a strong inference of scienter. Numerous confidential witnesses here claim they "believed that Periolat was terminated due to the inventory issues that led to the restatement," TAC ¶ 267, and speak to the magnitude of the overhead allocated as improper inventory. The confidential witnesses, however, do not speak to Periolat's state of mind. Periolat may have been terminated for gross negligence, as the SEC charged, and not for intentional conduct. Thus, these statements do not provide a strong inference of scienter. Similarly, confidential witness number 13 does not aid plaintiffs. This witness, a former VeriFone senior manager from 2006 to 2008 in the supply chain operation, was asked to analyze a $9 million variance in inventory. TAC ¶¶ 63, 240. The witness submitted a report to Periolat and others, reporting that the supply chain finance group had applied a "wild amount of overhead" and improper in-transit accruals to record "inflated inventory." *Id.* This report, however, was prepared prior to Periolat's adjustments; consequently, it does not demonstrate scienter with respect to the adjustments at issue here.

Defendants make much of the SEC's failure to charge Periolat with conduct that requires scienter as an element of his violation. Periolat is correct that the SEC Complaint "unequivocally demonstrates *the SEC's belief* that it could not establish that Mr. Periolat acted with scienter." Docket No. 231 (Periolat Motion) at 6 (emphasis added). The SEC's belief is irrelevant, and the court will not speculate regarding the SEC's motivation. As Judge Ware recently found, "the SEC's discretionary determination with respect to prosecution is not determinative of whether [d]efendants, in fact, committed securities fraud." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp.2d 964, 975 n.15 (N.D. Cal. 2009) (Ware, J.). However, the court must consider all inferences, even ones unfavorable

to plaintiffs. The SEC has a lower bar for alleging scienter than does the private plaintiff under the PSLRA, *Sec. & Exch. Comm'n v. Berry*, 580 F. Supp.2d 911, 920-21 (N.D. Cal. 2008) (Whyte, J.); consequently, the SEC's decision not to plead scienter hurts plaintiffs' ability to plead a strong inference of scienter in this private action.

In combination, these facts bespeak gross negligence, not conscious recklessness, and are insufficient to allege a strong inference of scienter. Indeed, Periolat did not attempt to hide his changes and there is no dispute that VeriFone had difficulty in integrating Lipman's financial information. Again, even if Periolat could have done a better job at verifying the sheer magnitude of his adjustments by consulting Lipman personnel, the benign inference of Periolat's acts—a lack of intent to deceive shareholders—is more likely than an inference finding intent or recklesness.

Moreover, even if Periolat did act with scienter, his actions are not attributable to VeriFone. In the Ninth Circuit, a corporation is deemed to have acted with scienter with regard to a public statement only if the director or officer who made the alleged misstatement acted with scienter. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers, who . . . are necessarily aware of the requirements of SEC regulations and state law and of the 'danger of misleading buyers and sellers.'" (citation omitted)). It is undisputed that Periolat was not a VeriFone officer, and he made none of the challenged statements. Periolat's misconduct is therefore not attributable to VeriFone.

Plaintiffs claim that Periolat violated 17 C.F.R. section 240.10b-5, which states: "It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Defendants argue that: 1) any claim under section 10b-5(b) fails because plaintiffs have not alleged that Periolat made or substantially participated in the making of any statement to the public; and 2) any claim under section 10b-5(a) or (c) fails because plaintiffs have failed to plead facts sufficient

United States District Court
For the Northern District of California

to meet the standards for "scheme" liability set forth by the Supreme Court in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).

The TAC does not plead that Periolat drafted, edited, signed, read, or even knew about the content of VeriFone's financial statements. However, there is no dispute that Periolat's accounting was incorporated in VeriFone's earnings releases, SEC filings and conference calls and communicated to investors. Consequently, plaintiffs claim that Periolat had a high-level role: primary responsibility for preparing VeriFone's company-wide gross margin forecasts, its core financial metric.

Plaintiffs do not dispute that Periolat himself made no statements to the market or shareholders and it disavows reliance on the group-published information presumption; thus, their only avenue for establishing section 10b-5(b) liability is to allege particularized facts which demonstrate "substantial participation or intricate involvement in the preparation of fraudulent statements." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000). Defendants claim that because the TAC fails to allege that Periolat had any involvement in the preparation of the alleged misstatements at issue here—VeriFone's financial statements and conference calls—plaintiffs fail to allege primary liability under section 10b-5(b).

Plaintiffs proffer evidence from the SEC transcripts of testimony to support the conclusion that Periolat's involvement in the preparation of VeriFone's SEC filings was indeed substantial or intricate. For example, plaintiffs proffer Zwarenstein's testimony that, "The biggest area of concern in COGS . . . [and Periolat] made that forecast . . . [Periolat was] the guy who . . . is going to be able to see what are the right numbers we're going to report to the SEC." TAC ¶ 124. Although plaintiffs' evidence shows that Periolat was responsible for determining COGS, it does not support the inference that Periolat had a substantial and intricate role in the actual making of VeriFone's public statements. If it did support such an inference, then any employee who had the misfortune of holding a position which involved the calculation or generation of information used by officers to make public statements could be held primarily liable under section 10b-5(b). Additionally, while the evidence supports the inference that Periolat falsified the COGS information, it does not support

the premise that he acted with the intent "to further a scheme to misrepresent" VeriFone's earnings to the public. *Stoneridge*, 552 U.S. at 161. A more compelling inference drawn from plaintiffs' evidence is that Periolat manually adjusted the inventory information, and hence the COGS, because he believed he was correct, as he had been in the past. Accordingly, plaintiffs have failed to allege that Periolat is primarily liable for his role in the calculation of COGS under section 10b-5(b).

Plaintiffs claim that Periolat is liable as a control person under 15 U.S.C. section 78t(a), which states: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Defendants argue that plaintiffs have failed to state a claim because they have not alleged a primary violation of securities law by VeriFone or that Periolat, a low-level employee, exercised actual power or control over the company. *See Howard*, 228 F.3d at 1065. For the reasons set forth below, because plaintiffs have failed to adequately allege a primary violation by VeriFone under Rule 10b-5, the section 78t(a) claim against Periolat must be dismissed.

II. Zwarenstein

Plaintiffs claim that the SEC complaint as well as evidence contained in certified transcripts of testimony relating to the SEC's investigation support a strong inference of scienter with respect to Zwarenstein. Neither the SEC complaint nor the transcripts of testimony, however, specify with particularity facts that demonstrate that Zwarenstein knew that Periolat's calculations were false, or that he acted with deliberate recklessness.

A. The SEC Complaint

The SEC alleged that Zwarenstein was aware of the preliminary results as well as Periolat's manual changes. Neither statement suggests that Zwarenstein knew Periolat's calculations were incorrect. Management's reliance on Periolat's changes does not suggest knowledge of their falsity because "[i]n the past, Periolat's forecasts had been accurate and relied on by VeriFone senior

United States District Court
For the Northern District of California

management." SEC complaint ¶ 15. The SEC also alleged that Zwarenstein sent instructions to management, and not Periolat, to "figure it [and related low results] out" and "fix the problem." Even if the email was meant for Periolat, these instructions do not lead to an inference that management sought to falsify VeriFone's books. Even though the SEC alleged that the "unmitigated disaster" email and "analyses" went to Periolat and others, nowhere does it allege that Periolat, or anyone else who received the email or "analyses," understood them to be coded instructions to falsify VeriFone's books. The allegations in the SEC complaint therefore do not lead to a strong inference of scienter with respect to Zwarenstein.

Courts have rejected similar attempts to turn statements like "figure it out" into something nefarious. For example, in *Indiana Electrical Worker's Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527 (5th Cir. 2008), where the plaintiffs alleged the CEO had "scream[ed] at a company financial analyst" because "revenue numbers were too low," and demanded that he "do something to fix that," the Fifth Circuit held that the CEO's statement "cannot contribute to a strong inference of scienter because it is 'susceptible to many interpretations, including innocent ones.'" *Id.* at 537-38. Likewise, in *In re CP Ships Ltd., Securities Litigation*, 506 F. Supp. 2d 1161, 1166 (M.D. Fla. 2007), the court held scienter was not pleaded by an allegation that, after receiving monthly reports from the manager of cost accounting, the CEO would sometimes complain that "[t]hese figures have to be wrong. Check them again." *See also In re Sonus Networks, Inc. Sec. Litig.*, No. Civ. A. 04-10294-DPW, 2006 WL 1308165, at *20 (D. Mass. May 10, 2006) (no inference of scienter from allegation that senior managers told the controller "'to get a number' in order to make the quarter" where plaintiffs failed to plead any employee "was told to do anything improper to get the number"). The most plausible inference to be drawn from the tone of Bergeron and Zwarenstein's communications is one of management seeking to determine why the preliminary report was not in line with forecasts, not one of accounting fraud. Management's desire to report results in line with forecasts leads to a similar inference, as does management's provision of "analyses" that could help bridge the shortfall in the preliminary report. Consequently, the inference

of scienter is not at least as compelling to the reasonable person as any opposing inference of non-fraudulent intent.

There is no dispute that VeriFone lacked adequate internal controls to timely discover the improper adjustment. Consequently, Periolat was able to make millions of dollars in incorrect adjustments to VeriFone's inventory accounting records without having the adjustments scrutinized or approved by more senior VeriFone management. Indeed, even though VeriFone's senior management, which presumably included Bergeron and Zwarenstein, were aware of Periolat's adjustments, they failed to question the forecasts for the second and third quarters; instead, they simply assumed the preliminary results were wrong when they differed from the forecasts. The lack of adequate internal controls; however, does not lead to a strong inference of scienter. The failure to question, and even willful disregard, does not constitute deliberate recklessness. *See Digimarc*, 552 F.3d at 991 (the deliberate recklessness standard requires plaintiffs to "plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." (quoting *Silicon Graphics*, 183 F.3d at 976)). Bergeron and Zwarenstein's failure to question Periolat regarding adjustments that caused his final report to be in line with his projections are not an extreme departure from the standards of ordinary care, especially in light of the correctness of Periolat's prior projections.

B. <u>SEC Transcripts of Testimony</u>

Plaintiffs proffer the transcripts of testimony relating to the SEC's investigation, however this evidence largely restates or elaborates upon the evidence proffered from the SEC Complaint and similarly fails to support a strong inference of scienter with respect to Zwarenstein.

Plaintiffs allege that Zwarenstein and Bergeron deliberately misrepresented the financial health of VeriFone in the wake of the merger with Lipman by falsely characterizing VeriFone's record increases in gross margin in the 1Q07, 2Q07 and 3Q07 as the result of "quality revenue," "nice procurement synergies" and "significant earnings accretion" resulting from the merger. TAC

¶¶ 87-88, 251. Plaintiffs allege that Zwarenstein and Bergeron knew or should have known that in reality there were significant problems related to the Lipman merger and that VeriFone's own gross margins were likely to decline as a result of these problems. For example, plaintiffs assert that Lipman's gross margins, prior to the merger, had steadily declined for the previous five years. TAC ¶ 250. Additionally, plaintiffs allege that Zwarenstein and Bergeron were aware that the incorporation of Lipman's largely international-sales-based gross margin with VeriFone's gross margins would put downward pressure on VeriFone's post-merger gross margin. *Id.* ¶¶ 251-54. Plaintiffs contend that Zwarenstein and Bergeron deliberately disregarded those facts and with "no reasonable basis" set unreasonably high targets for VeriFone's gross margins during the Class Period and resorted to the falsification of numbers to meet those targets. Plaintiffs' contentions, however, are belied by the fact that Zwarenstein and Bergeron relied on Periolat's adjustments to in-transit inventory to underpin the apparent increases in gross margin during the Class period. *Id.* ¶ 88. Thus, there was contradictory information with respect to the financial health of the company and the most cogent inference is that Zwarenstein and Bergeron relied on Periolat's expertise given that Periolat's calculations prior to the class period had been on point. SEC complaint ¶ 15. Indeed, the TAC does not allege with particularity that either Zwarenstein or Bergeron knew or had reason to know that Periolat's adjustments to in-transit inventory were false, and Zwarenstein and Bergeron's failure to note with accuracy the downward pressure that the Lipman merger was likely to have on VeriFone's gross margin does not support a strong inference of scienter.

Plaintiffs allege that a strong inference of scienter may be inferred from transcript evidence showing that Zwarenstein personally reviewed and calculated the numbers with respect to how, as a practical matter, VeriFone would be able to meet its quarterly forecasts. Plaintiffs also allege that Zwarenstein closely monitored and guided Periolat's adjustments, and proffer several emails purporting to show that Zwarenstein encouraged Periolat to falsely adjust the books in order to allow VeriFone to meet its forecast. For example, plaintiffs highlight an email from Zwarenstein to Bergeron in which Zwarenstein wrote, "We need a little over $10 million [of reduction in COGS] to get to 46.5 percent [gross margin.]" TAC ¶ 150. In another email from Zwarenstein to Periolat,

United States District Court
For the Northern District of California

Zwarenstein wrote, "I calculated that if everything else stayed the same, first margin percentage would need to be 47 percent exactly to get to 36 cents [EPS] rounded." TAC ¶ 157. These emails, however, do not support a strong inference of scienter because the more cogent inference is that Zwarenstein, as VeriFone's chief financial officer, would be concerned with exactly how VeriFone could reach its forecast. Accordingly, it is reasonable to conclude that as CFO, Zwarenstein would be actively involved in these types of calculations, and it is reasonable to believe that he would relay his conclusions to Periolat, whom he entrusted with the task of finding discrepancies in inventory stemming from the merger. The emails do not support a cogent inference that Zwarenstein had reason to know or must have known that Periolat's subsequent inventory adjustments were based on false information, especially in light of the fact that Periolat's calculations had until this point been accurate. *See Digimarc*, 552 F.3d at 1001 (permitting an inference of scienter where unlike here "the information misrepresented is readily apparent to the defendant corporation's senior management."). This is especially so given that the falsity of the information underlying Periolat's adjustments [here involving in-transit inventory and inventory overhead] was not "obvious from the operations of the company." *Id.* (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008)). Nor does the evidence support the inference that Zwarenstein himself made any adjustment to the numbers. *See Daou*, 411 F.3d at 1023 (finding a strong inference of scienter where executives themselves made manual adjustments to numbers.) Thus, although Periolat's adjustments resulted in an increase in inventory, viewed within the context of the recently completed merger, Zwarenstein and Bergeron's failure to focus on that increase may not be deemed to be deliberately reckless.

Plaintiffs also allege that Zwarenstein colluded with Bergeron to suggest to Periolat exactly where he could make adjustments to the books. For example, plaintiffs present another email from Zwarenstein to Bergeron in which Zwarenstein writes, "[included] in the seven to eight million in [proposed adjustments] is a one million place holder for your idea on component parts." *Id.* ¶ 162. Plaintiffs contend that Bergeron's "idea" was to instruct Periolat to falsely adjust component inventory by one million dollars. Plaintiffs argue that the fact that Periolat subsequently made a

United States District Court
For the Northern District of California

$900,000 adjustment to that category is evidence that Periolat acted pursuant to Bergeron's "idea." Plaintiffs' proffer falls short, however, because the fact that Zwarenstein suggested areas in which Periolat might double check his calculations or that Zwarenstein conveyed to Periolat Bergeron's suggestions for areas to check does not support a strong inference that either Bergeron or Zwarenstein intended that Periolat act with falsity. In this regard, the TAC does not properly allege that Zwarenstein had reason to know or knew that Bergeron's suggestions were made in bad faith or that Zwarenstein had reason to know there was no legitimate possibility that errors may have existed in, for example, Periolat's prior calculation of component inventory. In fact, it is plaintiffs' own contention that the merger with Lipman created multiple areas of uncertainty within the company, and accordingly, the more cogent inference with respect to these facts is that Zwarenstein and Bergeron legitimately believed that these discrepancies did in fact exist and accordingly asked Periolat to look for discrepancies in those areas. Accordingly, they directed Periolat to double check his work in those, among other, areas. Moreover, given that the TAC does not allege that the actual quantity, and therefore the proper calculation, of component inventory was readily accessible or obvious to Zwarenstein or Bergeron, they may not be held liable for suggesting that there may have been some legitimate miscalculation there. *Digimarc*, 552 F.3d at 1001 ("[n]othing in the complaint suggests that [Bergeron and Zwarenstein] had access to the underlying information from which the accounting numbers were derived.")

Plaintiffs also rely heavily on the testimony of VeriFone's Controller, Laura Merkl to establish a strong inference of scienter. Plaintiffs proffer Merkl's interpretation of the meaning of Zwarenstein's statements in various emails to support the conclusion that Zwarenstein intended Periolat to falsify the numbers. For example, Merkl supposes that Zwarenstein's email stating, "Get a crystal clear understanding of what it will take to get to 36.6 cents [EPS] cash using the correct model for EPS, and let [Periolat] know what his goal is in terms of non-GAAP [COGS] reduction" is correctly interpreted as Zwarenstein instructing Periolat to falsify the numbers. TAC ¶¶ 158-59. In another instance, Merkl states, with respect to the increase in in-transit inventory following Periolat's adjustments, that "I would be positive that it was discussed" between Zwarenstein and

United States District Court
For the Northern District of California

Bergeron. *Id.* ¶ 175. Plaintiffs point to several similar instances in which Merkl opines as to what Zwarenstein and/or Bergeron intended in addition to Merkl's version of Periolat's own understanding of Zwarenstein and Bergeron's statements. Merkl's testimony falls short of supporting a cogent inference of scienter because it is entirely speculative and provides little to no evidence as to the actual state of mind of either Zwarenstein, Bergeron or Periolat.

C. Confidential Witnesses

Plaintiffs' confidential witnesses fare no better. Allegations regarding accounting issues at VeriFone's facility in Rocklin, California are simply irrelevant to the accounting issues that led to VeriFone's restatements. The new confidential witnesses did not report to Zwarenstein or work in the same office as Zwarenstein, and none claims to have had any interactions with him regarding the events at issue. Consequently, it would be difficult for them to allege scienter with respect to Zwarenstein; they fail to do so here.

Plaintiffs' allegations regarding Zwarenstein's stock sales also fall flat. They concede that Zwarenstein's suspicious February 13, 2007 trade, and every subsequent trade, was scheduled pursuant to a 10b5-1 trading plan that Zwarenstein entered into on September 30, 2005, and amended on December 10, 2006—well before VeriFone's 1Q07 closed, and before he allegedly knew of the 1Q07 gross margin results and adjustments that eventually caused the restatement. Indeed, Zwarenstein continued to sell stock in accordance with the trading plan after VeriFone's stock price dropped, and retained over 40% of his stock when the stock price dropped.

Plaintiffs claim both the exceptions to the general rule that a restatement, by itself, does not establish scienter, are met. *See Digimarc*, 552 F.3d at 1000 ("Falsity may itself be indicative of scienter where it is combined with allegations regarding a manager's role in that company that are particular and suggest that defendant had actual access to the disputed information and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." (internal quotation marks omitted)); *see S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008). Neither exception is met.

Plaintiffs fail to adequately allege that management had actual access to the disputed information or that the error was obvious, because the proper allocation of overhead and the accounting of in-transit inventory are neither readily accessible nor obvious to management. The first exception permits general allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" to create a strong inference of scienter when these allegations are buttressed with "detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry*, 542 F.3d at 785. Here, monthly reports demonstrating a "sharp and unprecedented" increase in inventory, which was distributed to management, do not imply knowledge of the fraud. SEC complaint ¶ 27. In light of the recent acquisition of Lipman, management's knowledge regarding VeriFone's state of affairs pre-acquisition was likely outdated. The acquisition also negates the impact of the inventory increase. According to the SEC complaint, senior managers never questioned the increases, and Periolat was able to make the changes due to a lack of internal controls.

The Ninth Circuit recently addressed the narrow exception articulated in *South Ferry*. In *Digimarc*, the Ninth Circuit found insufficient a SAC that included allegations that senior management closely reviewed the accounting numbers generated each quarter and that top executives had several meetings in which they discussed quarterly inventory numbers. Here, just as in *Digimarc*, "[a]llegations that [VeriFone's] management had access to the purportedly manipulated quarterly accounting numbers, or that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated." 552 F.3d at 1000-01. Indeed, "[n]othing in the complaint suggests that [Bergeron and Zwarenstein] had access to the underlying information from which the accounting numbers were derived." *Id.* Plaintiffs' attempt to distinguish *Digimarc*, which is on all fours with this action, is unpersuasive. Although the magnitude of the restatement there was smaller, the size of the restatement must be discussed in relation to the size of the company. There is no evidence that the restatement in *Digimarc* was proportionally smaller than the restatement here. The esoteric nature



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

of the accounting practices at issue there also does not compel a different result. The complexity of the proper allocation of overhead as inventory and in-transit inventory is not significantly different than the complexity associated with determining whether expenditures incurred must be expensed or capitalized.

Secondly, the obviousness of Periolat's adjustment is undermined by the fact that Periolat's adjustment had no impact on the day-to-day operations of the company. Therefore, the adjustments did not relate to core business operations, as required for the second exception to be met. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008). Indeed, there was no immediate and massive effect on the operations of the company due to the manual adjustments, and the SEC complaint states that management simply assumed the correctness of Periolat's adjustments.

Finally, plaintiffs argue that the constellation of other allegations supports a strong inference of scienter. The constellation, consisting of the allegations regarding Sarbanes-Oxley certifications, employment actions, compensation and size of the restatement, has already been rejected. *See* First MTD Order at 12-15 (discussing Sarbanes-Oxley, the accounting department and the Lipman merger, personnel changes, forward-looking and misleading statements, purported admissions and compensation); *see also Digimarc*, 552 F.3d at 1001-06 (discussing Sarbanes-Oxley, personnel changes, compensation and stock sales). In light of controlling Ninth Circuit authority in *Digimarc*, the District of Oregon's decision in *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006), is not persuasive. Further allegations in the TAC regarding the aforementioned categories are deficient for the same reasons as specified in the court's prior order.

In sum, based on both an individual and holistic review, plaintiffs have not alleged a strong inference of scienter with respect to Zwarenstein. Plaintiffs therefore fail to allege claims under sections 10(b) and 20A, and SEC Rule 10b-5. These claims are dismissed with prejudice.

Plaintiffs' section 20(a) claim for control person liability also fails because their allegations that Zwarenstein exercised control over Periolat are insufficient. Merely holding an executive position within a company is insufficient for control person liability. *In re Atmel Corp. Deriv. Litig.*,

No. C 06-4592 JF (HRL), 2008 WL 2561957, at *11 (N.D. Cal. June 25, 2008) (Fogel, J.). Plaintiffs' allegations rely upon the SEC complaint, which specifically states that management did not review or approve Periolat's adjustments, and upon SEC transcripts of testimony, which relate communications between Zwarenstein and Periolat with respect to general calculations of gross margin but do not plead with particularity a control relationship. Without allegations of control, no control person liability can be found. Moreover, as discussed above, plaintiffs have been unable to allege that Zwarenstein directed Periolat to commit fraud. Without allegations of inducement, control person liability cannot be found. *See* 15 U.S.C. § 78t(a) (liability attached "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."). Accordingly, this claim is dismissed.

III. <u>Bergeron</u>

Neither the SEC complaint nor the transcripts of testimony demonstrate scienter with respect to Bergeron for the same reasons that they do not demonstrate scienter with respect to Zwarenstein.

It is not absurd for Bergeron and Zwarenstein to argue that they did not have knowledge of the errors simply because the errors had the effect of increasing gross margins. Although the accounting error affected the bottom line, as would many accounting errors, the proper focus of the scienter inquiry is on Bergeron and Zwarenstein's awareness of the underlying accounting errors, not the bottom line results affected by these errors. Plaintiffs allege no facts tending to show that Bergeron or Zwarenstein had any basis to assess whether the amount of overhead expense allocated to inventory at former Lipman subsidiary locations was reasonable or not. Neither do plaintiffs allege that Bergeron or Zwarenstein would have had any idea how much inventory was reported to be—as compared to how much actually was—in transit between its manufacturing and warehouse facilities.

Plaintiffs' confidential witness number 13 claims to have prepared a report in 1Q07, describing allegedly inflated inventory valuations. TAC ¶ 240. This report was therefore prepared prior to the in-transit adjustments that caused the restatement. Plaintiffs point to no aspect of VeriFone's restatement that relates to in-transit inventory errors made prior to Periolat's incorrect

entries. Consequently, the report, which does not appear to have been distributed to management, does not demonstrate Bergeron or Zwarenstein's knowledge of the incorrectness of Periolat's manual adjustments regarding in-transit inventory. All remaining confidential witnesses fail to allege, with specificity, that either Bergeron or Zwarenstein was aware of inaccuracies in VeriFone's financial statements.

Bergeron's stock sales also do not demonstrate scienter. Insider trading is suspicious only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (internal citation and quotation marks omitted). Among the factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*

Bergeron's trading history demonstrates that subsequent to the sale of 1.8 million shares on September 23, 2005, he sold approximately 100,000 shares per month, every month, from January 2006 to November 2006. Thereafter, subsequent to sales of approximately 350,000 shares in December 2006, which was prior to Periolat's manual adjustments, he sold approximately 200,000 shares per month, every month, from January 2007 to November 2007. Plaintiffs do not provide any information regarding Bergeron's sales after November 2007; consequently, the court cannot determine whether Bergeron's sales subsequent to the proposed class period were out of line with sales during the proposed class period.

Bergeron's trading pattern prior to the manual adjustments, when compared to his trading patterns subsequent to the manual adjustments, is relatively consistent. The consistency of his sales, even though the number of shares sold doubled in 2007, make Bergeron's sales not "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Metzler Investment GmbH v. Cornithian Colleges, Inc.*, 540 F.3d 1049, 1066-67 (9th Cir. 2008) (internal quotation marks and citation omitted). Moreover, Bergeron

retained approximately 40% of his shares at the time the restatement was made. Such trading pattern does not provide for an inference of scienter.

Finally, plaintiffs' remaining arguments regarding the fact or size or duration of the restatement is insufficient to establish scienter, as already found by this court. First MTD Order at 11-12. In sum, based on both an individual and holistic review, plaintiffs have not alleged a strong inference of scienter with respect to Bergeron. Plaintiffs' claims under sections 10(b) and 20A, and SEC Rule 10b-5 therefore fail. Plaintiffs' section 20(a) claim against Bergeron fails for the same reasons as those articulated above with respect to Zwarenstein.

IV. Bondy/Atkinson

There are no allegations of scienter regarding Bondy and Atkinson other than suspicious stock trades. Bondy, through GTCR, maintained a consistent trading pattern from December 2005 through September 2007, selling 2.5 million shares on December 27, 2005, 3 million shares on June 23, 2006, 3 million shares on December 19, 2006, 3.5 million shares on June 25, 2007, and 3.3 million shares on September 13, 2007, all in the open market. This trading pattern does not suggest scienter.

Similarly, plaintiffs do not allege any facts demonstrating that Atkinson—a marketing executive—possessed, or could reasonably be expected to have possessed, non-public information about VeriFone's inventory accounting or financial reporting systems. Atkinson's trading history in the open market thus provides no evidence of scienter as he amended his 10b5-1 plan in January 2007, before Periolat made his manual adjustments in February 2007.

In sum, based on both an individual and holistic review, plaintiffs have not alleged a strong inference of scienter with respect to Bondy or Atkinson. Plaintiffs' claims under sections 10(b) and 20A, and SEC Rule 10b-5 therefore fail. Plaintiffs' section 20(a) claim fails because the meager and conclusory allegations that Bondy or Atkinson exercised control over Periolat are insufficient.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

CONCLUSION

For the above-mentioned reasons, defendants' motions to dismiss are GRANTED with prejudice.

IT IS SO ORDERED.

Dated: March 7, 2011

MARILYN HALL PATEL
United States District Court Judge
Northern District of California